**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

COLLEEN LAW,                              )
                                         )
          Plaintiff,                     )
                                         )
     v.                                  )   C. A. No. 15-528-SLR-SRF
                                         )
CAROLYN W. COLVIN,                       )
Commissioner of Social Security,         )
                                         )
          Defendant.                     )

## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

Plaintiff Colleen Law ("Law") filed this action on June 23, 2015 against the defendant

Carolyn W. Colvin, the Commissioner of the Social Security Administration (the

"Commissioner").  Law seeks judicial review pursuant to 42 U.S.C. § 405(g) of the

Commissioner's September 18, 2013 final decision, denying Law's claim for disability insurance

benefits ("DIB") under Title II of the Social Security Act (the "Act") for the period of November

2, 2004 to October 18, 2007.

Currently before the court are Law's and the Commissioner's cross-motions for summary

judgment. (D.I. 9; D.I. 11) Law asks the court to reverse the Commissioner's final decision and

enter an award of benefits or, alternatively, to remand her case for further administrative

proceedings.  (D.I. 10 at 1) The Commissioner requests that the court affirm the decision.  (D.I.

12 at 16) For the reasons set forth below, I recommend that the court DENY Law's motion for

summary judgment and GRANT the Commissioner's cross-motion for summary judgment.

## II.    BACKGROUND

### A.    Procedural History

Law protectively filed a DIB application on June 2, 2006, which was denied on October 13, 2006. (Tr. at 98–103, 106, 65–69)  Her request for reconsideration was denied on August 30, 2007. (*Id*. at 73–78) Law then filed a request for a hearing, which occurred on September 9, 2008. (*Id*. at 79, 25–59) The Administrative Law Judge, Edward J. Banas (the "ALJ"), issued a partially favorable decision, finding Law disabled as of October 19, 2007, but not prior to that date. (*Id*. at 9–24) On August 11, 2010, the Appeals Council denied Law's request for review of the ALJ's decision. (*Id*. at 1–8, 680–84, 739–41) Law sought judicial review of the decision, and on May 24, 2011, this court remanded the matter for further proceedings to address conflicting information regarding the disability onset date, and to evaluate the treating source statements of Crag Fultz, M.D. (*Id*. at 672–75) Specifically, the ALJ was to further consider the period of November 2, 2004, the alleged onset disability date, to October 18, 2007, the day prior to the date of disability previously determined. (*Id*. at 623)

The ALJ held a subsequent hearing on August 8, 2013. (*Id*. at 620–41) In the following September 18, 2013 written decision, the ALJ found that Law was not disabled at any time from November 2, 2004 through October 18, 2007. (*Id*. at 620–41) The Appeals Council subsequently denied Law's request for review on April 27, 2015, and the ALJ's decision became the Commissioner's final decision. (*Id*. at 603–06) On June 23, 2015, Law brought a civil action in this court seeking judicial review of the Commissioner's final decision. (D.I. 1) On January 4, 2016, Law filed a motion for summary judgment, and on February 2, 2016, the Commissioner filed a cross-motion for summary judgment. (D.I. 9; D.I.11)

2

## B.     Medical History

### 1. Relevant period

Law was born in 1958, and she was forty-six years old on her alleged onset date. (Tr. at 98) She is considered a younger individual under 20 C.F.R. 404.1563(c). (*Id.* at 633) Law graduated from high school and has one year of college education. (*Id.* at 126) She worked as a building manager, facilities coordinator, foreperson, and building maintenance manager until her alleged onset date of November 2, 2004. (*Id.* at 128)

Law began to have neck and upper extremity pain following a motor vehicle accident that occurred on October 17, 2003. (*Id.* at 269) Craig W. Fultz, M.D., an orthopedic surgeon, diagnosed her with degenerative disc disease and foraminal stenosis at C5–6 and C6–7. (*Id.* at 177–80) Following the accident, she continued to work until exhausting conservative treatment options. (*Id.*) On October 21, 2004, Dr. Fultz gave Law a disability certificate, excusing her from work pending a scheduled surgery. (*Id.* at 386) He performed an anterior cervical discectomy and fusion ("ACDF") surgery at C5–6 and C6–7 on November 3, 2004 to relieve Law's symptoms. (*Id.*) After the surgery, Dr. Fultz continued to fill out disability certificates until February of 2006, stating that Law could not work in any capacity, with no return date listed. (*Id.* at 387–99)

In January of 2005, Dr. Fultz prescribed a regimen of physical therapy, and Law's initial evaluation occurred on February 9, 2005. (*Id.* at 273–77) The initial evaluation indicated that Law was experiencing right sided neck, upper trapezius, and arm pain, aggravated by looking up, bending forward, rotating, and sitting or standing for more than five minutes. (*Id.* at 276) However, a March 22, 2005 progress note indicated that Law had been unable to participate in physical therapy for the past three weeks as a result of illness. (*Id.* at 294–96)

3

At a March 16, 2005 follow up appointment with Dr. Fultz, Law reported that her pain and range of motion had improved. (*Id*. at 330) An April 7, 2005 MRI of the spine revealed status post anterior cervical fusion of C5, C6, and C7, and a new finding of right paracentral/posterolateral disc protrusion with mild to moderate impingement upon the right foramen. (*Id*. at 181–82) Law had "felt good for two months" after the surgery, but she had a sudden recurrence of pain radiating into her right arm. (*Id*. at 263) She later stated that her symptoms had been relieved after the surgery until April. (*Id*. at 252) Consequently, Dr. Fultz referred Law to Malik N. Momin, M.D. for cervical epidural steroid injections. (*Id*.) Dr. Momin administered a set of three injections on April 21, June 6, and November 10, 2005. (*Id*. at 259–64)

Law followed up with Dr. Fultz on May 25, 2005, complaining that her neck and shoulders hurt. (*Id*. at 323) Dr. Fultz recommended epidural injections. (*Id*. at 325) In June, she stated that the injection did not help. (*Id*. at 322) Given the diagnostic results, Dr. Fultz did not believe there was any structural abnormality that could be addressed by surgery. (*Id*. at 323) Accordingly, because she was not an immediate surgical candidate, Dr. Fultz referred Law to a pain management physician, William A. Rolle, Jr., M.D., for evaluation and treatment. (*Id*. at 407–08) On July 27, 2005, Dr. Rolle reported that Law complained primarily of right neck pain radiating into her right shoulder and upper extremity. (*Id*.) She stated her symptoms were exacerbated by prolonged sitting, standing, walking, lifting, exercising, coughing, and driving, but she obtained relief from medication, by lying down, and by applying heat and ice to her neck. (*Id*.) Upon evaluation, Law's range of motion in her neck was limited, but normal with respect to her upper extremities. (*Id*.) Dr. Rolle recommended epidural injections and increased pain medication. (*Id*.)

Law reported to Dr. Fultz on August 17, 2005 after tweaking her neck in bed. (*Id.* at 319) Again, Dr. Fultz reported no structural injuries to the neck, so Law returned to Dr. Rolle on August 19, 2005. (*Id.* at 320, 406) Dr. Rolle reported that X-rays were normal and noted that Law stated her pain had increased, however, her range of motion had significantly improved. (*Id.*) Dr. Rolle could not explain this contradiction, but he suggested switching to a different pain medication. (*Id.*)

Law reported to Community General Osteopathic Hospital on September 4, 2005 with left neck pain. (*Id.* at 186) There, she received an injection and pain medication, and she was advised to follow up with her physician. (*Id.* at 186–191) Law followed up with Dr. Rolle on September 6, 2005, complaining of severe neck pain with no specific injury contributing to the onset of pain. (*Id.* at 405) Law stated the pain was so intense she could barely move. (*Id.*) Dr. Rolle recommended increasing pain medication, a new CT scan, and further treatment consistent with diagnostic findings. (*Id.*) A September 8, 2005 CT scan showed post-surgery changes at the C5 through C7 levels with no evidence of complication related to the hardware, and reversal of the normal lordosis in the upper cervical region. (*Id.* at 193) By September 13, 2005, Law reported that her symptoms had improved, and although she still had pain, she was able to drive herself to the visit. (*Id.* at 404) Dr. Rolle noted that she had "[d]ramatically improved since her last office visit." (*Id.*)

On September 21, 2005, Law was evaluated by Stephen K. Powers, M.D. of the Pennsylvania Neurosurgery & Neuroscience Institute, Inc. (*Id.* at 223–26) Dr. Powers reported that Law was experiencing right sided neck and shoulder pain, but the tingling in her arm had subsided. (*Id.*) She had been using a TENS unit, pain patches, and oral pain medication for pain management. (*Id.*) She stated that all she could do was lie in bed and watch TV during the day

5

as a result of the pain. (*Id.*) Dr. Powers reported that upon evaluation, Law had good range of motion in her neck, but weakness in the right arm. (*Id.*) She was alert, oriented, and conversed freely during the exam. (*Id.*) Given the delayed onset of neck and upper arm pain following the ACDF procedure, Dr. Powers recommended additional diagnostics and a second surgery to extend the fusion and remove a disc at C4–5. (*Id.*) However, in October, Law stated that she was feeling the best she had felt in a while, so she was not sure that she wanted to go through with an additional surgery. (*Id.* at 403) She had even decreased her pain medication, and the physician's assistant at Dr. Rolle's office noted that she had "improved dramatically," and was "much better overall." (*Id.*) However, on October 18, 2005, Dr. Fultz ordered nerve studies after Law reported that her neck and arm still hurt. (*Id.* at 316–18) In November, Dr. Fultz stated that the studies showed an acute right C5 radiculopathy, but a chronic C6 radiculopathy was no longer evident. (*Id.* at 314) He continued to recommend injections before proceeding with surgical intervention. (*Id.*)

By January 2006, Law stated that she was doing "pretty well overall." (*Id.* at 481) Her pain was maintained by medication. (*Id.*) On February 1, 2006, she followed up with Dr. Fultz, reporting that her neck and arm were feeling a little better, as she had improved by approximately thirty to forty percent and her symptoms were tolerable. (*Id.* at 311) Accordingly, Law did not want to pursue further invasive treatment options. (*Id.* at 312) In March, she reiterated this sentiment after stating that she felt stable, having had a significant reduction in pain and an improvement in quality of life. (*Id.* at 480) At a June 2006 follow up appointment with Dr. Fultz, she reported that her neck and arm were "holding their own" with respect to her symptoms. (*Id.* at 307–08) Dr. Fultz opined that "with as well as she is doing [he] would not encourage any surgical intervention. Her symptoms are well controlled by Pain Management.

She is a functioning individual." (*Id.* at 309) On June 27, 2006, Law, again, stated that overall things had been fairly stable for her, although, she noted some increase in pain corresponding to personal stressors. (*Id.* at 479) However, on June 29, 2006, Dr. Rolle wrote a letter concerning Law's disability determination, reporting that "Ms. Law remains unable to perform any substantial gainful activity because of her physical condition." (*Id.* at 602) He also made mention of the Commonwealth of Pennsylvania's early disability retirement grant to Law in support of his position. (*Id.*) Also, on September 28, 2006, he completed Law's application for a disability parking placard, indicating that Law qualified because she was "severely limited in [] her ability to walk due to an arthritic, neurological or orthopedic condition." (*Id.* at 410–11) Nonetheless, that same day, Law stated that she was doing well and her current pain medication regimen was sufficient. (*Id.* at 412) She was also completing a home exercise program two to three times per day as instructed by her physical therapist. (*Id.*)

State agency medical consultant, M. Golish, completed a physical residual functional capacity assessment on October 12, 2006. (*Id.* at 413–18) He opined that Law had some limitations with respect to lifting, standing, walking, sitting, pushing, and pulling, but that she was not completely unable to perform these tasks. (*Id.* at 414) Golish reported that the severity of her symptoms was only partially proportionate to expectations because despite severe subjective complaints, Law remained neurologically intact, her motor function had not changed, the pain had fluctuated, her pain was controlled by medication, and she refused additional surgery or epidurals. (*Id.* at 418)

Law then began treatment with a new primary care physician, Catherine DeLuca, M.D. In her first treatment report dated November 7, 2006, Dr. DeLuca did not discuss neck pain. (*Id.* at 546) Dr. DeLuca did note a new diagnosis of depressive disorder and prescribed

antidepressant medication. (*Id*. at 546) However, Dr. DeLuca included no discussion of psychiatric symptoms in her report, aside from noting that symptoms of anxiety, depression, mood changes, and insomnia were not present on evaluation. (*Id*. at 545)

That same month, Benjamin T. Burger, an occupational therapist, conducted a functional abilities assessment for purposes of Law's disability determination. (*Id*. at 419–36) Although Law reported pain as a nine or ten out of ten, Burger concluded that Law could complete sedentary to light work, but she could not return to her job as a building services manager. (*Id*. at 419) Despite her pain, she demonstrated the ability to lift and carry up to twenty pounds at waist height, and up to fifteen pounds at shoulder height. (*Id*.)

On January 5, 2007, Dr. Rolle reported that Law stated she was feeling worse and experiencing more pain in her neck and upper extremities. (*Id*. at 477) Her physical exam was normal, with the exception of restricted range of motion in the right shoulder due to pain. (*Id*.) Dr. Rolle recommended a cervical spinal cord stimulator. (*Id*.) Subsequently, in March, Law stated that she was not ready to pursue the stimulator, and her symptoms were fairly well controlled by pain medication. (*Id*. at 476) At that time, Dr. Rolle indicated that physical exam findings were normal and Law's pain was stable, so he had no further treatment interventions to offer. (*Id*.)

At a routine physical appointment on February 13, 2007, Dr. DeLuca reported that Law felt well with only minor complaints. (*Id*. at 537) There was no indication of neck pain, and the musculoskeletal evaluation was normal with full range of motion. (*Id*. at 538–39) Dr. DeLuca did not discuss psychiatric symptoms in her assessment and plan. (*Id*. at 539) On April 13, 2007, Law brought up worsening depression symptoms with Dr. DeLuca and asked for a psychiatric referral, as she said that over the weekend she "felt like taking a bunch of Vicodin." (*Id*. at 533)

8

Law assured the doctor that she was not suicidal, and Dr. DeLuca provided a list of psychiatrists in the area. (*Id.* 534) In May, Dr. DeLuca increased Law's antidepressants after Law came in following a physical altercation with her partner. (*Id.* at 530–31) At that visit, Law reported that she had not yet seen a counselor or psychiatrist, but she was considering doing so. (*Id.*) In August, Law reported that she started to see a psychiatrist, Nathan L. Centers, who wanted to lower her medication dosage. (*Id.* at 527) Law did not have any other complaints at that visit, although neck pain and depression were noted upon review of systems. (*Id.*)

Law told Dr. Centers that she experienced both depression and anxiety, although, there is no history of anxiety reported in the medical records for the relevant time period. (*Id.* at 577) At an office visit on August 6, 2007, Dr. Centers reported that Law's energy was poor and her mood was sad and slightly anxious. (*Id.* at 577–78) At a follow up appointment later that month, Law reported a slightly better mood after switching medications. (*Id.* at 584)

On August 28, 2007, Dr. M. H. Borek conducted a case analysis at the request of the ALJ, in which he reported that Law's activities were limited by chronic neck pain, but she could still do light cleaning, microwave meals, and shop for necessities. (*Id.* at 550–551) He found Law's subjective allegations to be only partially credible given treatment notes indicating no motor deficits. (*Id.* at 552) Consequently, Dr. Borek suggested reaffirming the initial RFC finding for light activities with limits on reaching. (*Id.* at 551)

### 2. After the relevant period

After the relevant time period, different physicians filled out forms for purposes of Law's disability determination with the Social Security Administration and the Commonwealth of

Pennsylvania.[1] Jeffrey Heckert, M.D. with Dr. DeLuca's office completed a form for the State Employees' Retirement System on November 9, 2007, indicating that Law was limited in her ability to perform previous employment with the Commonwealth due to significantly decreased range of motion and chronic pain. (*Id.* at 553–54) G. Somari, M.D. and Jennifer Rahn, PA-C, of Coastal Pain Care Physicians also stated that Law was limited by her chronic neck and shoulder pain. (*Id.* at 575–76) Dr. Centers completed a Mental Residual Functional Capacity Assessment on March 24, 2008. (*Id.* at 572–74) He reported that Law has no limitation with understanding and memory, the ability to carry out short and simple or detailed instructions, sustain an ordinary routine without special supervision, coordinate with others without being distracted by them, make simple work related decisions, ask questions or request assistance, or respond appropriately to changes in the work setting. (*Id.*) However, he stated that she was markedly limited in her ability to maintain attention and concentration for extended periods due to her physical pain, and to work a complete normal workday or week without interruptions from psychological symptoms. (*Id.*) Two consecutive days of work exhaust her to the point where she has to sleep all day, and sometimes she is unable to get out of bed because of her depression. (*Id.*)

---

[1] Medical evidence after the relevant time period may be relevant to show a previous disability. *See Robinson v. Colvin*, Civ. No. 14-662-SLR, 2015 WL 5838469, at *5 n.6 (D. Del. Oct. 5, 2015) (citing *Smith v. Bowen*, 849 F.2d 1222, 1225 (9th Cir.1988) ("medical evaluations made after the expiration of a claimant's insured status are relevant to an evaluation of the pre-expiration condition"); *Wooldridge v. Bowen*, 816 F.2d 157, 160 (4th Cir. 1987) (same); *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984) ("medical evidence of a claimant's condition subsequent to the expiration of the claimant's insured status is relevant evidence because it may bear upon the severity of the claimant's condition before the expiration of his or her insured status"); *Dousewicz v. Harris*, 646 F.2d 771, 774 (2d Cir. 1981) (a diagnosis even several years after the actual onset of the impairment is entitled to significant weight); *Stark v. Weinberger*, 497 F.2d 1092, 1097 (7th Cir. 1974) (same)).

### C.    Hearing Before the ALJ

#### 1. Law's testimony

Law testified that she could not raise her right hand normally without using her left, and she demonstrated the same when she took the oath to give her testimony. (*Id.* at 652–53) She stated that this problem stemmed from the 2003 motor vehicle accident. (*Id.* at 653) She also testified that pain shoots down her arm, and she had trouble with grip since the alleged onset date of disability. (*Id* at 654–55) She did not wish to pursue additional surgery for fear of making the problem worse. (*Id.* at 656) Law testified that during the relevant time period, she would have had absolutely no tolerance for working, as she experienced pain on a ten out of ten level, and often had to lie down all day. (*Id.* at 657–58) Law stated that she never recovered from her ACDF surgery to the point where she could have worked a full time job. (*Id.* at 658) Law did not further testify extensively regarding her alleged disability, as she stipulated to the background information provided to the ALJ at the first hearing. (*Id.* at 652)

#### 2.Vocational expert testimony

The ALJ posed the following hypothetical to the vocational expert (the "VE"):

> [A] younger individual with a high school plus education, and a past work similar to that of the claimant and assume, you know, despite what this person might complain of, this—this person would have the capacity to occasionally lift and carry 20 pounds/frequently lift and carry 10 pounds; stand and walk about six hours in an eight-hour workday; periodically alternating sitting and standing for relief of pain or—or discomfort on an occasional basis that would take place; would be able to push or pull in upper extremities laterally, however, would not be able to do any overheard [sic] work; lower extremities would be unlimited; could occasionally climb, stoop, knee crouch, crawl; would—as far as reaching, would be limited in reaching overhead, but could do unlimited handling, fingering, feeling; would not have any visual or communicative limitations, however, environmentally, should have to—the person would have to expose— concentrated to—exposure to heat and cold.

> …as a result of pain, the person would be limited to just simple, routine tasks that wouldn't entail—wouldn't require a high degree of concentration.

11

> With those limits, would this person be capable of performing the past jobs that the person did, you know, previously?

(*Id.* at 662) The VE testified that the person described by the ALJ's hypothetical would not be able to return to previous work that Law formerly participated in, including building maintenance supervisor, building manager, facilities manager, and floor person. (*Id.* at 633, 662) However, the VE explained that this hypothetical person would be able to complete jobs at the light, unskilled level, including pre-assembler for printed circuit boards, mail clerk, and assembler II for small products. (*Id.* at 663)

> The ALJ then changed the hypothetical as far as the exertional limits:

> We're going to keep the age, education, and work history the same. This time as far as occasionally lift—exertionally, [sic] occasionally lift 10 pounds/frequently lift and carry 10 pounds; stand and walk two hours in an eight-hour workday; sit two—eight hours—the six hours in an eight-hour workday, but with occasional alternating positions from sitting and standing; also this person would be limited in pushing and pulling overhead; also would be able to occasionally—I'd eliminate any—any climbing or working at heights, but balancing, stooping, kneeling, crouching would be occasional; also limited in reaching overhead; have no visual communicative limitations would be limited as far as environmentally to avoiding concentrated exposure to extreme cold or heat; and would be limited to just simple, routine tasks.

> Would—would those limits—what, if any, jobs could this person do?

(*Id.* at 663–64) In response, the VE testified that at the sedentary, unskilled level, the individual described would be able to work as a taper for circuit boards, order clerk for food and beverage, and final assembler. (*Id.* at 664)

### 3. The ALJ's findings

Based on the factual evidence in the record, including that which was submitted for the original hearing, and the testimonies of Law and the VE, the ALJ determined that Law was not

disabled under the Act for the relevant time period from November 2, 2004 through October 18, 2007. (*Id.* at 623–35) The ALJ found, in pertinent part:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2009.

2. The claimant did not engage is substantial gainful activity during the period from her alleged onset date of November 2, 2004 through October 18, 2007.

3. During the period from her alleged onset date of November 2, 2004 through October 18, 2007, the claimant had the following severe impairment: Cervical spine degenerative disc disease, status post cervical fusion.

4. During the period from her alleged onset date of November 2, 2004 through October 18, 2007, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that, during the period from November 1, 2004 through October 18, 2007, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a), with occasional alternating position from sitting to standing. The claimant was limited to no overhead work, no climbing or working around heights, occasional balancing, kneeling, and stooping, and had to avoid concentrated exposure to extreme cold and heat. Additionally, the claimant was limited to simple, routine tasks.

6. During the period from her alleged onset date of November 2, 2004 through October 18, 2007, the claimant was unable to perform any past relevant work.

7. The claimant was born on April 19, 1958 and was 46 years old, which is defined as a younger individual age 45–49, during the relevant period under consideration.

8. The claimant had at least a high school education and was able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant was "not disabled" during the period from her alleged onset date of November 2, 2004 through October 18, 2007 whether or not the claimant had transferable job skills.

10. During the period from her alleged onset date of November 2, 2004 through October 18, 2007, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed.

11.    The claimant was not under a disability, as defined in the Social Security Act, at any time from November 2, 2004, the alleged onset date, through October 18, 2007.

(*Id*. at 625–35) (citations omitted)

## III.    STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive if they are supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3) (2015). Judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See id*. In other words, even if the reviewing court would have decided the case differently, the court must affirm the ALJ's decision if it is supported by substantial evidence. *See id*. at 1190–91.

Substantial evidence is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (quoting *Jesurum v. Sec'y of the United States Dep't of Health & Human Servs*., 48 F.3d 114, 117 (3d Cir. 1995)). As the United States Supreme Court has explained, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

14

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If "reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *See id.* at 250–51 (internal citations omitted). Thus, in the context of judicial review under § 405(g):

> [a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.

*Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of a claimant's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 826 F.2d 240, 245 (3d Cir. 1990).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the [Commissioner]'s decision with or without remand to the [Commissioner] for rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

IV.    DISCUSSION

A.    **Disability Determination Process**

Title II of the Social Security Act affords insurance benefits "to persons who have

contributed to the program and who suffer from a physical or mental disability." 42 U.S.C. §

423(a)(1)(D) (2015); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). A disability is the "inability

to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A claimant is only disabled if his impairments are so severe that he is unable to do his previous

work or engage in any other kind of substantial gainful work existing in the national

economy. *Id*. § 423(d)(2)(A); *Barnhart v. Thomas,* 540 U.S. 20, 21–22 (2003). To qualify for

disability insurance benefits, a claimant must establish that he was disabled prior to the date he

was last insured. 20 C.F.R. § 404.131 (2016); *Matullo v. Bowen*, 826 F.2d 240, 244 (3d Cir.

1990).

The Commissioner must perform a five-step analysis to determine whether a person is

disabled. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427–28 (3d Cir.

1999). If the Commissioner makes a finding of disability or non-disability at any point in the

sequential process, the Commissioner will not review the claim further. 20 C.F.R. §§

404.1520(a)(4), 416.920(a)(4)(i). At step one, the Commissioner determines whether the

claimant is engaged in any substantial gainful activity. *See id*. §§ 404.1520(a)(4)(i),

416.920(a)(4)(i) (mandating finding of non-disability when claimant is engaged in substantial

gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires

the Commissioner to determine whether the claimant is suffering from a severe impairment or a

severe combination of impairments. *See id*. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (mandating

finding of non-disability when claimant's impairments are not severe). If the claimant's

impairments are severe, at step three, the Commissioner compares the claimant's impairments to

a list of impairments that are presumed severe enough to preclude any gainful work. *See id*. §§

404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's

impairment or its equivalent matches a listed impairment, the claimant is presumed disabled. *See*

20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or

in combination, fails to meet or medically equal any listing, the analysis continues to step four

and five. *See id*. §§ 404.1520(e), 416.920(e).

    At step four, the ALJ considers whether the claimant retains the residual functional

capacity (the "RFC") to perform his past relevant work. *See id*. §§ 404.1520(a)(4)(iv),

416.920(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work);

*Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do

despite the limitations caused by his or her impairment(s)." *Fargnoli v. Halter*, 247 F.3d 34, 40

(3d Cir. 2001). The claimant bears the burden of demonstrating the inability to return to past

relevant work. *See Plummer*, 186 F.3d at 428.

    If the claimant is unable to return to past relevant work, at step five, the Commissioner

must demonstrate that the claimant's impairments do not preclude him from adjusting to any

other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating finding of non-

disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. In other words,

the Commissioner must prove that "there are other jobs existing in significant numbers in the

national economy which the claimant can perform, consistent with his medical impairments, age,

education, past work experience, and [RFC]." *Plummer*, 186 F.3d at 428. The ALJ must

analyze the cumulative effect of all the claimant's impairments in determining whether he or she is capable of performing work and is not disabled. *See id.* The ALJ often seeks the VE's assistance in making this finding. *See id.*

### B.     Whether the ALJ's Decision is Supported by Substantial Evidence

On September 18, 2013, the ALJ found Law was not disabled within the meaning of the Act during the relevant time period from the alleged onset date of November 2, 2004, to October 18, 2007. (Tr. at 623–35) The ALJ concluded that, despite Law's severe impairment (cervical spine degenerative disc disease), she had the residual functional capacity to perform a range of sedentary work. (*Id.* at 628) After considering the VE's testimony, the ALJ found that although Law could not return to her previous work, during the relevant time period, there were jobs that existed in significant numbers in the national economy that Law could have performed. (*Id.* at 633–34)

Law asserts four arguments on appeal: (1) the ALJ improperly dismissed Law's mental impairments as non-severe; (2) the ALJ improperly discounted Law's treating physicians' opinions; (3) the ALJ improperly evaluated Law's credibility; (4) the ALJ improperly relied on VE testimony, which was based on a flawed hypothetical omitting some of Law's limitations, in making his RFC findings.

### 1. Substantial evidence supports the ALJ's finding that Law's alleged mental impairments were not severe

Law contends that the ALJ committed an error of law in finding that her mental impairments were "not severe." (D.I. 10 at 7) Specifically, the ALJ erred in rejecting medical findings of Law's treating psychiatrist, Dr. Centers, whose reports indicate a severe impairment. (*Id.* at 9)

To reach his conclusion that Law did not have a severe mental impairment during the relevant period, the ALJ assessed the four functional areas set out in the disability regulations for evaluating mental disorders, known as the "paragraph B" criteria. *See* 20 C.F.R. § 404, Subpt. P, App. 1 (2015); (Tr. at 627) These areas include activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decomposition. 20 C.F.R. § 404, Subpt. P, App. 1, at § 12.00(C). To find a marked rather than mild limitation in one of these areas, the impairment must be more than moderate, but less than extreme, and the limitation must seriously interfere with the ability to function independently, appropriately, effectively, and on a sustained basis. *Id.*

First, with respect to activities of daily living, the ALJ found that Law had a mild limitation. (Tr. at 627) "[A]ctivities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. § 404, Subpt. P, App. 1, at § 12.00(C)(1). The ALJ based his finding primarily upon Law's own daily activities questionnaire. (Tr. at 627) In the questionnaire, Law reported that she was able to clean, do laundry, prepare simple meals, drive a car, and shop for necessities. (*Id.* at 138–41) She went to the store about two to three times per week. (*Id.* at 141) Additionally, she lived alone and did not need help with personal hygiene. (*Id.* at 138–39) Accordingly, substantial evidence supports the ALJ's conclusion that Law did not exhibit marked restriction in activities of daily living.

Second, the ALJ found a mild limitation in social functioning. (*Id.* at 627) Initiating social contact with others, communicating clearly with others, or interacting and actively participating in group activities are indicative of strength in social functioning. *See* 20 C.F.R. §

19

404, Subpt. P, App. 1, at § 12.00(C)(2) (2015).  Law reported that although she could become agitated from lack of sleep or pain, she spent time with others on a daily basis, even though her activities were limited.  (Tr. at 142–43) She stated that she had never been fired or laid off from a job due to social interactions, and she had no problem with getting along with authority figures. (*Id*. at 144) There were no behavioral abnormalities with cooperation reported at health evaluations.  Therefore, there is substantial evidence to support the ALJ's finding that Law's restriction in social functioning was only mild.

Third, the ALJ found that Law has a mild limitation in the functional area of concentration, persistence, or pace. (*Id*. at 627) Law indicated that her condition affected every listed item on her abilities questionnaire except hearing, however, she also reported that she did not need special reminders to take care of personal needs, she was able to handle her own finances, and her attention and concentration was variable depending on her sleep and medications.  (*Id*. at 139–43)  Additionally, the ALJ pointed out that the record fails to show that Law's medications caused her to experience cognitive deficits.  (*Id*. at 627)  Law asserts that Dr. Centers opined that she was markedly limited in her ability to maintain attention and concentrate during a normal work day, however, Dr. Centers also noted that Law reported improved sleep and mood during treatment.  (*Id*. at 577–84; D.I. 10 at 8–9) Additionally, Dr. Centers noted that her attention and concentration was "fair," but also that she had no limitations with understanding and memory, the ability to carry out short and simple or detailed instructions, sustain an ordinary routine without special supervision, coordinate with others without being distracted by them, make simple work related decisions, ask questions or request assistance, or respond appropriately to changes in the work setting. (Tr. at 572–74, 578) Dr. Centers also gave Law a GAF score of 65 upon assessment, which indicates only mild symptoms or limitations,

20

and that the patient generally functions well.[2] (*Id.*) Accordingly, substantial evidence supports

the ALJ's conclusion that Law did not exhibit a marked restriction in concentration, persistence,

or pace.

Finally, the ALJ found no episodes of decompensation of extended duration during the

relevant time period. (*Id.* at 627) Because Law's medically determinable mental impairments

caused no more than mild limitations in any of the first three functional areas, and no episodes of

decompensation of extended duration in the fourth area, the ALJ properly found that Law's

mental impairments were non-severe. *See Robinson*, 2015 WL 5838469, at *13–14. Law asserts

that the ALJ erred in assigning little weight to Dr. Centers, however, the ALJ accorded little

weight to his opinions because they are not supported by the record. (D.I. 10 at 9; Tr. at 626–27)

There is little mention of any psychological symptoms before Law began seeing Dr. Centers in

2007. (Tr. at 626–27) Her treating physicians repeatedly described her as alert and fully

oriented. (*Id.*) Additionally, Dr. Center's treatment notes and GAF score contradict the assertion

---

[2] The GAF scale ranges from 0 to 100 and is used by a clinician to indicate his overall judgment
of a person's psychological, social, and occupational functioning on a scale devised by the
American Psychiatric Association. *Robinson v. Colvin*, Civ. No. 14-662-SLR, 2015 WL
5838469, at *4 n.9 (D. Del. Oct. 5, 2015) (citing American Psychiatric Association, *Diagnostic
& Statistical Manual of Mental Disorders* (Text Revision, 4th ed. 2000) (*DSM-IV-TR*)). A GAF
of 31-40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at
times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or
school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends,
neglects family, and is unable to work ...)." *Id.* A GAF of 41-50 indicates "[s]erious symptoms
(e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious
impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a
job)." *Id.* A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial
speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school
functioning (e.g. few friends, conflicts with peers or co-workers)." *Id.* A GAF of 61-70
indicates "[s]ome mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty
in social, occupational, or school functioning ..., but generally functioning pretty well, has some
meaningful interpersonal relationships." *Id.*

that Law was severely limited by mental impairments. (*Id.* at 572–74, 578) Consequently, the court finds there is substantial evidence to support the ALJ's finding that Law's mental impairments were non-severe during the relevant period.

## 2. The ALJ properly weighed the objective medical evidence and opinions of Law's treating physicians

Law contends that the ALJ improperly rejected the opinions of her treating physicians, Dr. Fultz, Dr. Rolle, and Dr. Centers, without an adequate explanation. (D.I. 10 at 9) She argues that the ALJ erred in assigning "little weight" to Dr. Fultz's opinion that Law was unable to return to even sedentary work as a result of her ongoing symptoms, narcotic pain medication, and inability to drive or be productive, because the ALJ disregarded or minimized significant medical evidence. (*Id.* at 10–12) Similarly, it was improper to assign "limited weight" to Dr. Rolle's opinion that Law was unable to perform any substantial gainful activity. (*Id.* at 11–13) Finally, the ALJ failed to explain why he assigned only partial weight to Dr. Centers' opinion that Law had a moderate mental impairment. (*Id.* at 13) Law contends that the errors were "particularly egregious" because the ALJ did not rely on any contrary opinion from any examining physician, and the ALJ also rejected the state agency physician's finding that Law could perform light work. (*Id.* at 14)

To determine the proper weight to give a medical opinion, the ALJ is required to weigh all the evidence and resolve any material conflicts. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971). Generally, the weight afforded to any medical opinion is dependent on a variety of factors, including the degree to which the opinion is supported by relevant evidence and consistent with the record as a whole. 20 C.F.R. § 404.1527(c)(3)–(4) (2012). To that end, the

22

more consistent an opinion is with the record as a whole, the more weight is given to that opinion. *Id.* § 404.1527(c)(4).

The ALJ must first assess whether a medical opinion is from a treating, non-treating, or non-examining source. *Id.* §§ 404.1502, 416.902; *see also Fletcher v. Colvin*, Civil Action No. 12-920-SRF, 2015 WL 602852, at *9 (D. Del. Feb. 11, 2015), *report and recommendation adopted*, 2015 WL 1284391 (D. Del. Mar. 19, 2015). The opinion of a treating physician—one who has an "ongoing treatment relationship" with the patient—is entitled to special significance and controlling weight if supported by objective medical evidence, and if it is consistent with other substantial evidence in the record. 20 C.F.R. § 404.1502; *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(d)(2)). On the other hand, a treating physician's opinion does not warrant controlling weight if unsupported by clinical and laboratory diagnostic findings, and if it is inconsistent with other substantial evidence. *See* 20 C.F.R. § 404.1527(c)(2); *Fargnoli*, 247 F.3d at 42–43. The more a treating source presents medical signs and laboratory findings to support the medical opinion, the more weight it is given. *See Robinson v. Colvin*, Civ. No. 14-662-SLR, 2015 WL 5838469, at *12 (D. Del. Oct. 5, 2015). Likewise, the more consistent a treating physician's opinion is with the record as a whole, the more weight it should be afforded. *Id.*

An ALJ may not reject a treating physician's assessment based on his or her own credibility judgments, speculation, or lay opinion, and the ALJ cannot disregard a treating physician's opinion without explaining his or her reasoning or referencing objective conflicting medical evidence. *Morales v. Apfel,* 225 F.3d 310, 317 (3d Cir. 2000); *Gilliland v. Heckler*, 786 F.2d 178, 184 (3d Cir. 1986). Even when the treating source opinion is not afforded controlling weight, the ALJ must determine how much weight to assign it by considering factors such as

length, nature, and frequency of treatment visits, nature and extent of the treatment relationship, whether the opinion is supported by medical evidence, whether the opinion is consistent with the medical record, and the medical source's specialization. 20 C.F.R. §§ 404.1527(d), 416.927(d).

In the present action, the court finds that the ALJ did not err in affording Law's treating physicians' opinions less than controlling weight. The ALJ gave little weight to Dr. Fultz's opinion that Law was disabled because the reports were conclusory, they did not give specific restrictions or limitations, and they were inconsistent with the record as a whole because treatment notes indicated that Law was improving. (Tr. at 631) Dr. Fultz filled out forms twelve times excusing Law from work, and he opined that Law was unable to return to any kind of work because of her ongoing symptoms, requirement of narcotic pain medication, and inability to drive or be productive. (*Id.* at 387–99, 820) However, Law reported that pain medication managed her symptoms. (*Id.* at 308) She also drove to appointments and to the store two to three times per week, and she reported that she was able to live alone and take care of herself. (*Id.* at 404, 138–41) Furthermore, Dr. Fultz stated that Law was a functioning individual and that he did not encourage surgical intervention with as well as she was doing. (*Id.* at 308–09) Law even confirmed that she wanted to pursue conservative treatment, as she had improved by approximately thirty to forty percent and her symptoms were tolerable. (*Id.* at 311–12) The Commissioner's regulations explain that an opinion that a claimant is "disabled" or "unable to work" is not a medical opinion and is not given special significance because opinions as to whether or not a claimant is disabled are reserved for the Commissioner. 20 C.F.R. § 404.1527(d) (2012). Given that Dr. Fultz's opinions that Law could not return to work, even at the sedentary level, are inconsistent with his own treatment notes and the record as a whole, the

court finds that substantial evidence supports the ALJ's decision to assign little weight to Dr. Fultz's opinions.

Dr. Rolle's opinion that Law was unable to perform any substantial gainful activity for an indefinite duration is similarly conclusory and inconsistent with the record. Dr. Rolle continued to report that Law's symptoms were improving after surgery. (Tr. at 476–524) Treatment notes indicate that Law was stable and that medication controlled her symptoms. (*Id.* at 400–02) In October of 2005, Law reported that she was feeling the best she had felt in a while. (*Id.* at 403) Despite the 2005 MRI indicating a disc herniation, by 2007, although range of motion was somewhat limited, Dr. Rolle reported normal strength, reflexes, and sensation. (*Id.* at 476) In assigning weight to Dr. Rolle's opinions, the ALJ considered the treatment records in conjunction with Law's own report that she could engage in light cooking, cleaning, shopping, and driving. (*Id.* at 631) Additionally, he explained that Dr. Rolle's reliance on Law's entitlement to state retirement benefits as a factor supporting disability was misguided, as the two analyses are dependent upon different statutory schemes. (*Id.*) Accordingly, because Dr. Rolle's opinion is conclusory and inconsistent with the record as a whole, as properly detailed by the ALJ, substantial evidence supports the ALJ's decision to assign limited weight to his opinion.

The ALJ's decision to give partial weight to Dr. Centers' opinion to the extent that it was consistent with the RFC is likewise supported by substantial evidence. As discussed, *supra*, Dr. Centers opined that Law was markedly limited in her ability to maintain attention and concentration so much so that she would not be able to complete a normal work day or work week. (*Id.* at 573) Law contends that the ALJ improperly failed to explain why he rejected Dr. Centers' opinion in this regard; however, the ALJ gave a detailed explanation as to how the conclusion was inconsistent with the medical treatment records. (*Id.* at 632; D.I. 10 at 13) For

25

example, the finding was inconsistent with Dr. Centers' assessed GAF score of 65, and progress

notes showed improved mood and sleep with treatment. (Tr. at 632) Additionally, Law had only

discussed depression in a limited capacity with Dr. DeLuca, but Dr. DeLuca did not explicitly

report on clinical findings outside of the diagnosis itself. (*Id*. at 526–47) Accordingly no

objective findings support such a restricted limitation, and both Law's self-reported activities and

Dr. Centers' own notes contradict the assertion that Law experienced marked mental limitations

that prevented her from working during the relevant time period. Therefore, substantial evidence

supports the ALJ's partial acceptance of Dr. Centers' opinions, and the ALJ did not improperly

weigh Law's treating physicians' opinions.

### 3. Substantial evidence supports the ALJ's credibility findings

Law also asserts that the ALJ failed to properly evaluate her credibility within the RFC

evaluation because the ALJ did not specifically explain the credibility finding, consider prior

work history, or consider witness testimony from the first hearing. (D.I. 10 at 18–20)

In reaching the RFC findings, the ALJ adhered to a two-step process for evaluating the

symptoms of Law's impairments. (Tr. at 628–29) *See* SSR 96-7P, 1996 WL 374186 (July 2,

1996). First, the ALJ considered whether there was an underlying medically determinable

physical or mental impairment that could reasonably be expected to produce Law's

symptoms. (Tr. at 628–29) Second, the ALJ evaluated the intensity, persistence, and limiting

effects of Law's symptoms to determine the extent to which the symptoms limited Law's ability

to do basic work activities. (*Id*.) Whenever the individual's statements about the intensity,

persistence, or limiting effects of pain or other symptoms are not substantiated by objective

medical evidence, the adjudicator must make a finding on the credibility of the individual's

statements based on a consideration of the entire case record. SSR 96-7P. In the present action,

the ALJ concluded that there were medically determinable impairments that could reasonably produce Law's symptoms, but that Law's "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely credible for the reasons explained in [the] decision." (Tr. at 629) Law contends that this explanation is insufficient. (D.I. 10 at 18–20)

An ALJ must give great weight to a claimant's testimony only "when this testimony is supported by competent medical evidence," and an ALJ may "reject such claims if he does not find them credible." *Schaudeck v. Comm'r of Social Sec. Admin.*, 181 F.3d 429, 433 (3d Cir. 1999). "Inconsistencies in a claimant's testimony or daily activities permit an ALJ to conclude that some or all of the claimant's testimony about her limitations or symptoms is less than fully credible." *Garrett v. Comm'r of Soc. Sec.,* 274 Fed. App'x 159, 164 (3d Cir.2008) (citing *Burns v. Barnhart,* 312 F.3d 113, 129–30 (3d Cir.2002)). Generally, the ALJ's assessment of a claimant's credibility is afforded great deference because the ALJ is in the best position to evaluate the demeanor and attitude of the claimant. *See, e.g., Fargnoli v. Massanari,* 247 F.3d 34, 43 (3d Cir.2001). However, the ALJ must explain the reasons for his credibility determinations. *Ayers v. Astrue*, 724 F. Supp. 2d 471, 479 (D. Del. 2010).

The ALJ outlined Law's testimony that she was unable to maintain any job due to pain during the relevant time period. (Tr. at 629) Immediately following the conclusion that Law's symptoms were not entirely credible, the ALJ outlined objective medical evidence and statements Law made to physicians, which contradicted Law's testimony. (*Id.* at 629–30) Although the ALJ did not explicitly provide a contradiction in the record for each of Law's subjective complaints, the ALJ's analysis of the medical evidence is "sufficiently specific to make clear to [Law] and to any subsequent reviewers the weight the adjudicator gave to [Law's] statements," as required by SSR 96-7P. *See* SSR 96-7P, 1996 WL 374186 (July 2, 1996). The

27

ALJ reviewed Law's medical history, pointing out that Law repeatedly reported improvement following her ACDF surgery, she chose to be treated conservatively after the finding of a new disc herniation, and she stated that medications were managing her symptoms to the point where she was stable. (Tr. at 629–30) Despite limitations, objective medical evidence also revealed normal sensation and motor strength in the upper extremities, improved range of motion, and normal strength and coordination upon physical examinations. (*Id.*) Moreover, both Dr. Fultz and Dr. Rolle reported that Law was doing well by 2008. (*Id.*)

"[T]he ALJ is not required to supply a comprehensive explanation for the [treatment] of evidence; in most cases, a sentence or short paragraph would probably suffice." *Brank v. Astrue*, 636 F. Supp. 2d 335, 349 (D. Del. 2009) (quoting *Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981)). Law faults the ALJ for only partially crediting her testimony. However, the contrast between her testimony and the medical documentation, as reviewed by the ALJ, supports the determination that Law was not fully credible. *Lee v. Barnhart*, 248 Fed. App'x 458, 462 (3d Cir. 2007). Accordingly, the ALJ did not err in citing to these inconsistencies, which negatively impacted Law's credibility.

Law also cites *Taybron v. Harris*, 667 F.2d 412 (3d Cir. 1981) to support her argument that the ALJ improperly failed to consider Law's work history in making the credibility finding. (D.I. 10 at 19) In *Taybron*, the Third Circuit stated in a footnote: "when the claimant has worked for a long period of time, his testimony about his work capabilities should be accorded substantial credibility." *Taybron*, 667 F.2d at 415 n.6. However, this does not change the notion that the record as a whole must still support the testimony to afford great weight to the claimant's subjective complaints. *See Schaudeck v. Comm'r of Social Sec. Admin.*, 181 F.3d 429, 433 (3d Cir. 1999). In *Taybron*, the Third Circuit found that the claimant met that criteria because while

28

he had a steady work history before his accident, "[e]very doctor who examined Taybron acknowledged he was in great pain" after. *Taybron*, 667 F.2d at 415 n.6. Accordingly, it was not Taybron's work history alone that entitled his testimony to great weight, but the work history in conjunction with supportive objective medical evidence. *Id.*[3] In the present action, for the reasons previously explained, the contrast between Law's testimony and the evidence in the record supports the ALJ's decision to find Law's testimony concerning intensity, persistence, and limiting effects, not fully credible.

Finally, the ALJ was not required to perform an evaluation of the credibility of Sarabeth Sayers, who briefly testified at Law's first hearing before the ALJ in 2008. Law cites *Burnett v. Comm'r of Soc. Sec. Admin.,* 220 F.3d 112, 122 (3d Cir. 2000), to support her assertion that the ALJ had to consider this testimony. (D.I. 10 at 19–20) However, this court has already distinguished *Burnett* in a situation where the witness failed to submit testimony attesting to his observations of claimant's specific limitations. *See Thomas v. Colvin*, Civil Action No. 10-78-GMS-SRF, 2014 WL 6847740, at *12 (D. Del. Dec. 4, 2014), *report and recommendation adopted*, 2015 WL 970838 (D. Del. Feb. 26, 2015). In *Thomas*, the ALJ did not consider a note submitted by a claimant's witness that explained his familiarity with the claimant's health difficulties and attested to the claimant's general character. *Id*. This court distinguished *Thomas* from *Burnett* because the witness did not specifically identify impairments or health problems, and he did not mention or describe any functional limitations that the claimant may have experienced. (Tr. at 47–48) Similarly, here, without describing actual limitations, Ms. Sayers

---

[3] *See also Henn v. Colvin*, 967 F. Supp. 2d 1263, 1283 (N.D. Iowa 2013) (quoting *Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001) (The ALJ did not err by failing to discuss claimant's work history, as "[i]f an ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so, [the court] will normally defer to that judgment.").

generally stated that Law's physical condition seemed to get progressively worse, and that she

and neighbors would do things for her. (*Id.*) Unlike *Burnett*, Ms. Sayers' cursory testimony

could do nothing to bolster Law's credibility. *See Thomas*, 2014 WL 6847740 at *12

(distinguishing *Burnett*, which required the ALJ to address testimony of additional witnesses

who may have bolstered the claimant's credibility). Furthermore, as in *Thomas*, Ms. Sayers'

testimony "does not provide new or additional evidence for consideration in the ALJ's RFC

determination," and "[t]he ALJ did not reject any findings within the [testimony] which would

require further discussion by the ALJ." *Id.* (citing *Fargnoli v. Massnari*, 247 F.3d 34, 42 (3d

Cir. 2001); *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 122 (3d Cir. 2000).

"In light of the discrepancies between [Law's] testimony and the observations of [her]

treating physicians, as well as the lack of objective medical evidence substantiating the claimed

severity of [her] impairments," the court finds that substantial evidence supports the ALJ's

finding that Law's testimony was "not entirely credible." *Thomas v. Astrue*, Civil Action No.

11-555-GMS, 2015 WL 4459065, at *13 (D. Del. July 21, 2015). (Tr. at 629)

### 4. Substantial evidence supports the ALJ's RFC and disability finding

Finally, Law contends that the ALJ improperly relied on the VE's testimony in finding

that Law could have performed existing jobs in the economy. She asserts that the VE's

testimony was based on a flawed hypothetical that did not include all of her limitations. (Tr. at

15–18) In particular, the ALJ's hypothetical did not account for Dr. Fultz's opinion that Law

could not work in any capacity for a full work day on a regular and continuing basis. (*Id.* at 16–

17) Additionally, the ALJ omitted Dr. Centers' assessment of marked limitations on Law's social

functioning. (*Id.* at 17) Because the court has rejected Law's assertion that Dr. Fultz's and Dr.

Centers' opinions were entitled to great weight because they were unsupported by the record, as

discussed *supra*, the ALJ has not erred on those grounds. *See Bacon v. Colvin*, Civ. No. 12-1477-GMS, 2016 WL 556727, at \*10 (D. Del. Feb. 12, 2016).

Law also asserts that the ALJ erred in acknowledging a limitation on overhead reaching, but not expressly limiting reaching in "all directions," despite the ALJ giving great weight to the state physician who checked the "reaching in all directions" limitation box on his evaluation form. (D.I. 10 at 17) "[A] hypothetical question must reflect *all* of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." *Holloman v. Comm'r of Soc. Sec.*, No. 15-2293, 2016 WL 475976, at \*4 (3d Cir. 2016) (quoting *Ramirez v. Barnhart,* 372 F.3d 546, 552 (3d Cir. 2004) (emphasis in original)). However, "the just-quoted language should not be misunderstood...Instead the directive in *Podedworny* is that the hypotheticals posed must 'accurately portray' the claimant's impairments and that the expert must be given an opportunity to evaluate those impairments 'as contained in the record.'" *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005) (citing *Podedworny v. Harris*, 754 F.2d 210, 218 (3d Cir. 1984)). As such, it is true that a perfect hypothetical question would have expressly referenced Law's limitation on reaching in "all directions." However, the ALJ's RFC adequately captured Law's impairments. The state physician explained that the limitation corresponded to pain and some reduced range of motion in the right shoulder. (Tr. at 416) However, he did not conclude that Law's range of motion was completely restricted. This finding is repeated throughout treatment records, including by Law's own pain management physician, Dr. Somari, who stated that Law was limited to reaching "overhead" only with the right arm. (*Id*. at 600) Furthermore, the state physician's "check the box" form combines all reaching into one category, without an option to

note different types of reaching. (*Id.* at 416) Finally, the VE was given the opportunity to evaluate Law's impartments from both her testimony and the medical record as a whole.

Moreover, Law fails to establish any harm to her substantial rights. *See Holloman*, 2016 WL 475976, at *4 (finding no reversible error where the ALJ's hypothetical was flawed but the claimant did not establish substantial harm). As the Third Circuit has explained, Law expounds no theory of how an explicit reference to reaching in "all directions" would have changed the VE's answers or the ALJ's ultimate step-five conclusions. *Id.* Law mentions in a footnote that the sedentary positions to which the VE suggested all required "frequent reaching," so Law could not perform any of them. (D.I. 10 at 17 n.12) However, Law does not explain the significance of using the words "reaching in all directions" as opposed to "reaching overhead."

Regardless, even if the ALJ had used the proposed terminology, such a limitation would not be preclusive. The VE testified that only one of the suggested sedentary positions, final assembler, required bilateral frequent reaching. (Tr. at 665) Law had an occasional reaching limitation due to limited range of motion in her right shoulder, but not both arms. (*Id.* at 416) The VE testified that an individual would be able to perform the duties of the other sedentary positions, taper and food clerk, with any reaching restriction that applied to only one arm because the unrestricted hand could perform the required duties. (*Id.*) Accordingly, whether restricted to reaching overhead or in all directions, Law would still be able to perform proposed sedentary positions, as her limitation did not apply bilaterally, and there is no finding that she would be unable to reach with her left arm. Therefore, Law fails to carry her burden of establishing harm to her substantial rights, and for the reasons discussed, *supra*, the hypothetical adequately captured all of Law's credibly established limitations. As such, substantial evidence

supports the ALJ's RFC findings, and substantial evidence supports the ALJ's disability determination.

## V.    CONCLUSION

For the foregoing reasons, I recommend that the court DENY Law's motion for summary judgment and GRANT the Commissioner's cross-motion for summary judgment.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objection and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006*)*; *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.


Dated: September 15, 2016

Sherry R. Fallon
United States Magistrate Judge